# In the United States Court of Federal Claims

No. 11-745C

(Filed: September 10, 2014)

*******************************************

)
**TRUST TITLE COMPANY,**                )
)
          **Plaintiff,**                )
)
  **v.**                )
)
**UNITED STATES,**                )
)
          **Defendant.**                )
)

*******************************************

Post-trial decision in contract case;
termination for default; reprocurement;
liquidated damages

Donald C. Holmes, Greensboro, Maryland, for plaintiff.  Of counsel was Andrew C. Bisulca, Woodbridge, Virginia.

Eric Laufgraben, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him at the trial and on the briefs was Michael N. O'Connell, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  With him on the briefs were Stuart F. Delery, Assistant Attorney General, Civil Division, Robert E. Kirschman, Jr., Director, and Bryant G. Snee, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was Todd P. Maiberger, United States Department of Housing and Urban Development, Office of General Counsel, Washington, D.C.

## OPINION

LETTOW, Judge.

In this contract case, the court conducted a trial from November 18 through 21, 2013 and February 5 through 6, 2014 in Washington, D.C.  In 2010, plaintiff, Trust Title Company ("Trust Title"), contracted with the United States Department of Housing and Urban Development ("HUD" or "the government") to provide real estate closing services for HUD, consisting of settlement and title services, in connection with the sale of HUD-owned properties in North Carolina to private buyers.  Trust Title was awarded two separate contracts, one for Eastern North Carolina and one for Western North Carolina, although the terms of the contracts are

virtually identical.  Just over three months after the beginning of performance on the contract, the government terminated both contracts for default.  Trust Title seeks conversion of these terminations for default to terminations for convenience.  Compl. ¶¶ 148, 157.[1]  Trust Title also seeks the reversal of estimated excess reprocurement costs assessed against it by the contracting officer in the total amount of $620,998.16.  Compl. ¶¶ 159-60.  Those costs are also at issue in connection with the government's counterclaim, which seeks recovery of the government's actual excess reprocurement costs for closing agent services in Eastern and Western North Carolina, plus liquidated damages, missing sales proceeds, and other damages for an overall total of $819,043.16.  Def.'s Answer and Counterclaim ¶¶ 185-193, ECF No. 17.[2]

# FACTS[3]

## I.  CONTRACTUAL DEVOLUTION

### A. Trust Title's Contracts

In April 2010, HUD's regional office in Atlanta solicited requests for proposals to perform closing services for sales of HUD-owned properties in Western North Carolina and Eastern North Carolina, respectively.  *See* DX 1.[4]  Trust Title submitted a proposal for each

---

[1]Prior to trial, both parties submitted a series of partial motions for summary judgment.  Trust Title's motion for partial summary judgment on entitlement, ECF No. 27, was denied, *see* Order of May 1, 2013, ECF No. 57, as was its motion for partial summary judgment to eliminate the defendant's reprocurement cost assessment, ECF No. 49, *see* Order of June 3, 2013, ECF No. 66.  Trust Title initially sought the costs it would be entitled to recover under a termination for convenience, *see* Compl. ¶¶ 6, 13, but later conceded that because it had not submitted a certified monetary claim to the contracting officer for those costs and damages prior to filing suit, as required by the Contract Disputes Act, 41 U.S.C. § 7103, this court did not have jurisdiction over such claims, *see* Def.'s Partial Mot. to Dismiss at 4-5, ECF No. 89; Pl.'s Opp'n to Def.'s Partial Mot. to Dismiss and to Bifurcate and Produce an Expert Report at 2-3, 6, ECF No. 97.  Because of that circumstance, the government's partial motion to dismiss, seeking to dismiss any claims by Trust Title for specific costs attendant to a termination for convenience, ECF No. 89, was granted, Order of Oct. 25, 2013, ECF No. 114.  Accordingly, those monetary claims are not presently before the court.

[2]The government has not pursued its claim for missing sales proceeds.  In fact, all sales proceeds have been remitted to the government.

[3]This recitation of facts constitutes the court's principal findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims.  Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis.

[4]Citations to defendant's exhibits are denoted as "DX __," and plaintiff's exhibits are identified as "PX __."  Defendant's demonstrative exhibits are cited as "DDX __," and plaintiff's demonstrative exhibits are cited as "PDX __."  Citations to the trial transcript are to "Tr. __."

contract, *see* DX 3 and DX 4, and was awarded both contracts on June 30, 2010, *see* DX 14. Trust Title's contracts with HUD were to become effective the next day, July 1, 2010.  *See* DX 15 (Contract C-ATL-01971 – the "West contract") and DX 16 (Contract C-ATL-01970 – the "East contract"); [5] Tr. 883:20-22 (Test. of Melisa Barbee, HUD Contracting Officer).  Its proposals were the lowest-priced, technically acceptable proposals. *See* DX 11; Tr. 877:1-8 (Barbee).

Delays occurred on both contracts that prevented Trust Title from immediately beginning performance.  For the East contract, HUD issued its first task order on July 1, 2010, ordering 1,800 in-house property closings and 540 third-party closings, consistent with the estimates in the contract.  DX 18 (Task Order 1 for East Contract); DX 16 at 4.[6]  Nevertheless, Trust Title could not begin performing closings on the East contract, Tr. 887:5-16 (Barbee), because the task order only reflected a funding amount of $399,215.00, DX 18 at 2, when, based on the estimated quantities of closings and other related services, funding in the amount of $553,450.00 was required, *id.* at 1.  At the time, there was a risk funding would never be fully provided.  Tr. 887:14-16 (Barbee).  A modification to this task order was signed on July 27, 2010 and became effective the next day, July 28, 2010.  DX 115.  This modification committed the additional money needed to fully fund the contract, and it ostensibly allowed Trust Title to begin performance on the East contract.  Tr. 887:17 to 888:8 (Barbee).  Receipt of a Trust Title Name Address Identification Number was necessary for Trust Title to begin performing closings, and Trust Title was not assigned that number until August 3, 2010.  Tr. 1221:19-23 (Test. of Christopher William ("Kip") Gardner, President of Trust Title).  Trust Title did not submit a claim for additional time or money as a result of the delayed funding for the East contract, and the modification recommitted Trust Title to its obligations as stated in the original contract.  Tr. 888:9-12 (Barbee).  On the East contract, Harrington Moran Barksdale, Inc. ("HMBI"), the asset manager responsible for marketing and selling HUD properties, first started assigning contracts to Trust Title on August 3, 2010.  *See* DX 90; *see also* Def.'s Post-Trial Br. at 5, ECF No. 153; Pl.'s Post-Trial Br. at 6-7, ECF No. 156.

On the West contract, two bid protests were filed, and a stop-work order directed Trust Title to cease any performance of the contract.  Tr. 883:23 to 884:11 (Barbee).  As a result, HUD did not issue its first task order on the West contract until August 6, 2010, following the resolution of the two bid protests.  Tr. 884:15 to 885:16 (Barbee); *see also* DX 20 (Task Order 1 for West Contract).  The period of performance on the West contract was thus August 6, 2010 through June 30, 2011.  Tr. 885:17-20 (Barbee).  Trust Title never submitted a request for more

---

[5]Except where otherwise noted, the proposals and contracts are substantially the same for both the Western and Eastern regions.  Thus, references to DX 3 are also applicable to DX 4 and vice-versa, and references to DX 15 are also applicable to DX 16 and vice-versa.

[6]A third-party closing is defined in the contract as "[a]ny instance where a purchaser/ funding lender uses a closing agent other than HUD's contracted closing agent."  DX 15 at 11. "Third[-]party closings are identical to a non-third[-]party closing with the exception that the [c]ontractor is not required to prepare the HUD-1."  DX 15 at 37.

money or time as a result of this delay on the West contract.  Tr. 399:12 to 401:1 (Gardner), 885:21 to 886:3 (Barbee).

In performing closing services for the sale of HUD-owned properties in North Carolina. Trust Title agreed to receive $224 dollars for every in-house closing and $225 dollars for every third-party closing.  DX 15 at 4.  These prices were to include all steps necessary to perform a closing, but notably did not include title insurance.  *Id.* at 3.  If a buyer opted to purchase title insurance from Trust Title, Trust Title was allowed to charge the buyer a title insurance premium.  *Id.* ¶ C.5.2.A.4(a)(3).  For an in-house closing, Trust Title was required to complete a 30-year title search for the property, prepare the deed, prepare the closing statement on Form HUD-1, conduct a closing, record the deed, and wire the proceeds to HUD by 2:00 p.m. on the next banking day following the closing.  *Id.* ¶¶ C.5.2, C.5.3, C.5.5.  Third-party closings were identical to in-house closings, except that Trust Title was not responsible for preparing the HUD-1.  Trust Title was required to physically attend all third-party closings.  *Id.* ¶ C.1.1.A.  HUD's standard sales contract provided that a closing must occur within 45 days, Tr. 40:4-10 (Test. of Ralph Jackson, Jr., Director of the Real Estate Owned Division of HUD's regional office in Atlanta), and Trust Title stated in its proposals that it could complete a closing within 38 days, Tr. 657:20 to 658:1 (Gardner).  Trust Title was also required to be familiar with HUD's Good Neighbor Next Door program and to obtain a copy of the pertinent housing notice and any updates and revisions.  DX 15 ¶ C.5.4.A.[7]  The contract was a requirements contract, although certain estimates were provided in the contract.  *Id.* ¶ I.3.  Each contract contained a maximum number of orders, 195 within 30 days, above which Trust Title was permitted to refuse any additional orders via written notice to the contracting officer within three days of receiving the order.  *Id.* ¶ I.3(b), (d).[8]  The contract also incorporated by reference a Federal Acquisition

---

[7]HUD's Good Neighbor Next Door program provides assistance to law enforcement officers or teachers to purchase homes.  Among other things, qualifying persons "must agree to execute a second mortgage and note in the name of the Department."  DX 15 ¶ C.5.4.A.2.

[8]The contract incorporated an order-limitations clause pursuant to 48 C.F.R. § 52.216-19. In pertinent part, the clause states,

> (b) Maximum Order.  The contractor is not obligated to honor —
>> (1) Any order for a single item in excess of 195;
>> (2) Any order for a combination of items in excess of 2340; or
>> (3) A series of orders from the same ordering office within 30 days
>> that together call for quantities exceeding the limitation in
>> subparagraph (b)(1) or (2) of this section.
> (c) If this is a requirements contract . . . , the Government is not required
> to order a part of any one requirement from the Contractor if that
> requirement exceeds the maximum-order limitations in paragraph (b) of
> this section.
> (d) Notwithstanding paragraphs (b) and (c) of this section, the Contractor shall honor any
> order exceeding the maximum order limitations in paragraph (b), unless that order (or
> orders) is returned to the ordering office within 3 business days after issuance, with
> written notice stating that Contractor's intent not to ship the item (or items) called for and

Regulation, 48 C.F.R. ("FAR") § 52.233-3, *id.* ¶ I.1, which provides for an equitable adjustment in the delivery schedule or contract price in the event of a stop-work order if "[t]he [c]ontractor asserts its right to an adjustment within 30 days after the end of the period of work stoppage . . . ." FAR § 52.233-3(b)(2).

### B.  Sequela

Beginning in early August, HMBI, HUD's asset manager, sent Trust Title a large number of contracts for closing, some of which had been held for a significant period of time while Trust Title's contracts were under stop-work orders.  Tr. 62:15 to 63:8 (Jackson), 394:18-24 (Gardner).[9]  Trust Title endeavored to set up offices in Charlotte and Raleigh and to commence operations.  *See infra*, at [16-17].  HUD otherwise did not act with alacrity to brief Trust Title on its processes and expectations; the post-award conference with Trust Title was not held until August 26, 2010.  Nonetheless, by late August, the contracting officer, Melisa Barbee, had concerns about Trust Title's ability to perform the assigned closings.  On August 31, 2010, Ms. Barbee sent Trust Title's President, Mr. Gardner, an e-mail requesting an estimate of how many closings Trust Title would be able to accomplish by September 30th.  DX 34.  At that time she was "getting e[-]mails, phone calls from customers, from management[, and] from [the] G[overnment ]T[echnical ]R[epresentative] about performance issues with Trust Title."  Tr. 894:16-18 (Barbee).  Fundamentally, closings were not occurring at HUD's desired rate.  Tr. 894:19 to 895:1 (Barbee).  A conference call among Mr. Gardner, Ms. Barbee, and others was held on or about September 1, 2010, during which Mr. Gardner informed Ms. Barbee that he would not be able to perform all of the outstanding closings by September 30th.  *See* Tr. 896:4-15 (Barbee).  Ms. Barbee testified that she wanted such a statement in writing, so she e-mailed Mr. Gardner to confirm the statements he made on the call.  Tr. 897:9-16 (Barbee); *see also* DX 42 (E-mail from Barbee to Gardner (Sept. 8, 2010)).  In response to Ms. Barbee's e-mail, Mr. Gardner wrote:

> Unfortunately we will not be able to meet the 612 closings as originally planned.  The reasons are many and include a new contractor, new

---

the reasons.  Upon receiving this notice, the Government may acquire the supplies or services from another source.

DX 15 ¶ I.3.

[9]The testimony and exhibits at trial do not consistently state how many orders Trust Title received in the first month of performance.  *Compare* Tr. 1221:11-13 (Gardner) ("[O]rders received in the first 24 business days or 30 calendar days w[ere] 650 orders."), *with* Tr. 1168:18-24 (Gardner) (stating that Trust Title received 763 cases during the first 30 days of performance).  The confusion appears to stem from uncertainty how to calculate the first "month" of performance on each contract, because they did not begin the same day, and how to determine precisely when an order was "received" by Trust Title.  *See* Tr. 670:10-25 (Gardner).  It is readily apparent to the court, and the parties agree, that Trust Title received far more than 195 closings per contract within the initial 30-day period.  *See* Def.'s Post-Trial Br. at 8 ("The important point, however, is that all of these numbers are considerably above the 390 limit. . . .").

> employees, new offices, no transition plan, significant backlog, undefined
> processes, conflicting requirements, etc.  However, the fact is we have
> employees working till midnight and beyond 6 & 7 days a week in an
> attempt to get ahead of the wave of orders and frustrated agents.  This is
> not a matter of just throwing "bodies" at a problem, there are backlog and
> workflow issues still being resolved while the orders continue to come in.
> An employee is unable to be productive with 350 e[-]mails a day.  We
> thought we would be able to contain the backlog issue early in the process
> but have been unable.

DX 42.  Ms. Barbee testified that she was unsatisfied by Trust Title's response, in part, because Trust Title's proposals had emphasized its experience in performing closings.  Tr. 897:24 to 898:11 (Barbee).

In Ms. Barbee's view, Trust Title's performance did not improve, and she sent a cure notice on September 16, 2010.  Tr. 898:12-18 (Barbee); *see also* DX 50 (Cure Notice).  The cure notice informed Trust Title of the government's concerns with its performance, and gave Trust Title an opportunity to demonstrate improvement.  Tr. 898:21-25 (Barbee).  The cure notice stated that as of September 14, 2010, there were 758 outstanding cases waiting to close, despite HUD's attempts to help Trust Title speed up the process by providing Trust Title with copies of the lenders' title policies and by allowing Trust Title to conduct ten-year title searches instead of 30-year title searches.  DX 50 at 1.  The cure notice also pointed to specific contractual obligations that Trust Title was not meeting.  Specifically, the government cited to the number of customer-service complaints it was receiving, the requirement that Trust Title physically attend third-party closings, the requirement that Trust Title wire the proceeds from a sale to HUD no later than 2:00 p.m. on the next banking day following closing, and the requirement that Trust Title send HUD reports reflecting the current status of all assigned closings.  *Id*. at 1-2.  HUD noted that as of the date of the cure notice, Trust Title had only closed 18 cases, and for 15 of those cases, the proceeds were not timely wired to HUD.  *Id*. at 2.  Finally, the cure notice informed Trust Title that it needed to submit a plan for improvement and that if the deficiencies were not "cured" within ten days of receipt of the notice, the government might terminate Trust Title for default.  *Id*. at 1.

Trust Title responded to the cure notice on September 24, 2010.  DX 132 (Trust Title's Response to Cure Notice).  Trust Title asserted that "[s]ervice contracts of this nature are generally phased in with the new contractor while being phased out with the previous contractor."  *Id*. at 1.  The contract, however, made no mention of a transition phase.  Trust Title's position was in part contradictory to its proposal, which had emphasized its ability to open offices quickly and to begin performance virtually upon award of the contract.  DX 3 at 27 ("Our new Western North Carolina office is scheduled to be opened upon receipt of the Solicitation award.  The Firm is experienced in opening and running branch offices . . . .  Our Firm has already purchased furniture and equipment necessary to open the office immediately, which leaves minimal additional expense."); *id*. at 28 (affirming that Trust Title could establish a remote office quickly and representing that it had previously opened a functioning office within ten business days); *see also* Tr. 879:1-18 (Barbee) (explaining that another offeror's proposal was technically unacceptable because it required four weeks to staff an office and that Trust

Title's proposal also would have been unacceptable if it specified a transitional period).  Trust Title further explained that it had underestimated the resources it would need to devote to communicating with attorneys frustrated over delayed closings due to the deferred beginning of performance.  DX 132 at 1.  But, Trust Title stated that it was addressing this issue and had "added additional personnel to reach out to the clients" and to handle the initial surge in assigned closings.  *Id*. at 2.  At trial, Mr. Gardner explained that Trust Title had hired one additional person in the Orlando office who was to work on the HUD contract remotely and allocated an existing employee in Orlando to work on the contract remotely.  Tr. 459:1-9 (Gardner).  Trust Title also maintained that HUD was contributing to Trust Title's performance difficulties by failing to provide a timely post-award conference, failing to provide necessary documents, and by being unfamiliar with banking laws in North Carolina, which required that funds only be disbursed after the recordation of deeds.  DX 132 at 2.  Trust Title also stated that it had been promised a "modification" by HUD whereby HUD would provide copies of title policies and foreclosure information with each file.  *Id*. at 3.  Mr. Gardner testified that he had intended this letter to explain improvements Trust Title was making but also to identify unresolved issues preventing performance.  Tr. 454:17-21 (Gardner).

Following the cure notice and response, the contracting officer sent Trust Title a "show cause letter" on October 7, 2010.  DX 55 (Show Cause Letter).  The letter stated, "The purpose of this show cause letter is to advise you that because of your failure to provide Closing Agent Services as required by [the contracts], the Government is considering terminating the contract[s] for default pursuant to [FAR §] 52.249-8 of the contract."  *Id*. at 1.[10]  According to HUD's records, the number of cases then waiting to close had reached 851, and Trust Title had succeeded in closing (or otherwise reconciling) 128 cases out of 1,027 assigned.  *Id*.  (HUD's numbers cannot be reconciled).  The show-cause letter reiterated the customer-service and timely-delivery-of-proceeds deficiencies first identified in the cure notice, and it also raised new, though related, deficiencies.  *Id*.  The government asserted that Trust Title was (1) not following the proper procedure for extension requests, (2) not following the proper procedure for cancelled contracts, and (3) retaining signed deeds longer than the permissible five days.  *Id*. at 2-3.  Moreover, the government responded to Trust Title's explanations for the difficulties it faced in performing closings by noting that the contract did not promise a transition period allowing the new contractor to be phased into performance.  *Id*. at 3.  Indeed, the "solicitation required that the offerors provide information that addresse[d] its experience, financial resources and general ability to establish an office quickly."  *Id*.  Additionally, HUD rejected Trust Title's contention that the delay of the post-award conference, to August 26, 2010, had negatively impacted Trust Title's ability to complete closings.  *Id*. at 4.  It also dismissed Trust Title's claim that HUD was not familiar with the "required forms, banking and [Real Estate Settlement Procedures Act

---

[10]In pertinent part, FAR § 52.249-8 provides that for fixed-price supply and service contracts, the government may terminate the contract in whole or in part if the contractor fails to "(i) [d]eliver the supplies or to perform the services within the time specified in this contract or any extension; (ii) [m]ake progress, so as to endanger performance of this contract . . . ; or (iii) [p]erform any of the other provisions of this contract . . . ."

("RESPA")[11]] regulations and conflicting requirement[s] in the contract," by stating that "[Trust Title has] not provided any relevant documentation to support [its] claim." *Id.* As part of the show-cause letter, HUD enclosed a series of spreadsheets listing the closings assigned to Trust Title, the closings performed by Trust Title and when proceeds were wired to HUD, and the deeds Trust Title improperly retained when closings did not occur or were postponed. *Id.*, Enclosures 2, 3, 6.

Trust Title's response to the show-cause letter largely blamed HUD for Trust Title's inability to perform closings. DX 61 at 1 (Trust Title's Response to Show Cause Letter) ("This letter will provide you with facts and circumstances that show that any inability to perform to the contract requirements w[as] due to circumstances beyond our control and without our fault or negligence. This letter will further show . . . that [HUD] knew or should have known of the numerous conflicts within this contract at the time of solicitation.")."[12] Trust Title asserted that (1) HUD was responsible for the backlog of cases, (2) HUD failed to provide required training, (3) HUD misunderstood North Carolina law regarding table funding,[13] (4) HMBI was uncooperative, (5) Trust Title had opened local offices in full compliance with the contract, (6) Trust Title could not ensure compliance with contract requirements by third-party attorneys in third-party closings, and (7) HUD misunderstood RESPA requirements. *Id.* Trust Title concluded its response by stating that "[i]f HUD believes its image may be better represented through a law firm, Trust Title will cooperate with HUD to achieve this through mutually acceptable means." *Id.* at 14-15.

A meeting between HUD and Mr. Gardner occurred on October 27, 2010 at Mr. Gardner's request. Tr. 913:3-21 (Barbee). Ms. Barbee prepared a contemporaneous record of this meeting. *See* DX 70 (Minutes of Meeting with Gardner (Oct. 27, 2010)). Her notes reflect that Mr. Gardner believed that certain requirements in the performance work statement

---

[11]RESPA is codified at 12 U.S.C. § 2601-2617. Among other things, it requires use of a HUD-1 settlement statement that itemizes fees charged by the lender or broker to a person applying for a loan to purchase real estate. *See* 12 U.S.C. § 2603 (entitled "[u]niform settlement statement").

[12]Trust Title did not dispute HUD's calculation of the number of cases assigned to Trust Title or the closings performed (1,027 assigned, 128 closed or otherwise reconciled) but argued that the numbers did not present the whole picture. DX 61 at 2 ("It is our position that this statement, while it may be mathematically correct, obfuscates the fact that this is a new contract . . . .)." Trust Title did, however, contend that HUD's records regarding extension requests and the mishandling of deeds and expired contracts were largely incorrect. *See id.* at 7.

[13]The contracts required that all closings be table funded, unless prohibited by state law. DX 15 ¶ C.5.3.2 ("All closings shall be table funded unless prohibited by state law, in which case alternative procedures shall be established in the Closing Agent's technical proposal."). Table funding means that funds are disbursed at the table when a deed is provided to the buyer at the time of closing. *See* Tr. 55:20 to 56:2 (Jackson); DX 15 ¶ C.2 (definition). In North Carolina, funds cannot be disbursed until a deed is physically recorded. Tr. 499:16-18 (Gardner); *see also* Tr. 583:4-14 (Fussell). Therefore, North Carolina law bars table funding as such.

were defective, and HUD knew or should have known that these tasks could not be performed. *Id.* at 3.  Moreover, she noted that "Mr. Gardner stated that if the [g]overnment wishes to work with him, he wants HUD to pay for [the] cost on the surge of his business, the additional resources or personnel he had to hire when he was awarded the contract.  He stated that if we terminated the contract for default he will seek damages because he believes HUD is at fault and knew the contract [wa]s defective." *Id.*  Ms. Barbee requested that Trust Title submit all outstanding sales proceeds to the Treasury by October 29, 2010, but "October 29th came and went and we did not get the proceeds.  And that's when I decided to terminate the contract."  Tr. 917:7-13 (Barbee).

### C. Termination

On November 9, 2010, HUD terminated its contracts with Trust Title for default, pursuant to FAR § 52.249-8, because "Trust Title failed to provide wire transfer of funds for closings and to provide a course of action to alleviate the backlog on closings assigned to Trust Title, per tasks in the Performance Work Statement."  DX 76 (Termination Notice) at 1.  The notice also stated that "[a]s of the date of this termination letter, the majority of the proceeds still have not been wired." *Id.*[14]  The notice advised Trust Title that HUD was seeking liquidated damages for the late wire transfers. *Id.* at 2.

### D. Reprocurement

After Trust Title's contracts were terminated for default, HUD began the process of reprocuring closing services.  Immediately following the termination, HUD used a "buyer select" model, whereby buyers selected their own closing agents, and HUD contributed up to $400 in closing-agent fees.  Tr. 129:6-15 (Jackson).  The buyer-select program continued for approximately 90 days.  Tr. 130:10-12 (Jackson).  The contracting officer, Ms. Barbee, issued a reprocurement solicitation on December 28, 2010.  Tr. 930:4-9 (Barbee); *see also* DX 137 (Reprocurement Solicitation and Amendments).  Given the urgent need to close contracts, Ms. Barbee used her discretion as to the manner of reprocurement pursuant to 41 U.S.C. § 3304(a)(2) (formally codified as 41 U.S.C. § 253(c)(2)).  Tr. 927:23 to 928:11 (Barbee); DX 137.  The reprocurement solicitation was sent to eight potential offerors identified by HUD's program office.  Tr. 928:12 to 929:18 (Barbee).  When issued, each contract was to last six months, with a six-month option period.  Tr. 933:9-23 (Barbee).  Ms. Barbee later intended to go back and resolicit the services using full and open competition.  Tr. 939:10-20 (Barbee).  Six contracts were awarded: two to Dale Fussell for both Eastern and Western North Carolina, DX 101 (Fussell East Reprocurement Contract), DX 102 (Fussell West Reprocurement Contract), two to J.E. Thornton for both Eastern and Western North Carolina, DX 97 (Thornton East Reprocurement Contract), DX 99 (Thornton West Reprocurement Contract), one to Peter Chastain for Western North Carolina, DX 98 (Chastain Reprocurement Contract), and one to Donato & Grewal for Eastern North Carolina, DX 100 (Donato & Grewal Reprocurement

---

[14]Trust Title provided HUD with all proceeds due. *See* Tr. 173:24 to 174:4 (Jackson) (testifying that there was one closing where HUD had not received the proceeds, but that the situation has since been resolved).

Contract).[15]  All of the contracts became effective on January 31, 2011, except Peter Chastain's, which became effective on February 18, 2011.  *See* DXs 97-102.

The government notes that the requirements specified in the performance work statement for each of these six contracts were almost identical to those set out in Trust Title's contract.  Tr. 932:11-19 (Barbee).  That representation is correct but misleading because the reprocurement contracts had a different basis for allotting the services to be performed.  The reprocurement contracts were indefinite delivery, indefinite quantity ("IDIQ") contracts as contrasted to requirements contracts, the work was split among four contractors, and some transition was provided.  *See* Tr. 927:7-11 (Barbee); *see, e.g.*, DX 97 ¶ B.1.  HUD changed the type of contract so that the closings "[would] be distributed evenly among a group of contractors."  Tr. 927:13-15 (Barbee).  The replacement contractors charged between $350 and $575 per closing.  Def.'s Post-Trial Br. at 52.[16]  The estimated quantities varied slightly among the contracts.  The contracts for J.E. Thornton, Peter Chastain and Donato & Grewal permitted them to reject any orders in excess of 175 within a 30-day period for a single contract.  DX 97 ¶ I.3, DX 99 ¶ I.3, DX 98 ¶ I.3, DX 100 ¶ I.3.  Mr. Fussell's contract for Eastern North Carolina allowed him to refuse any orders in excess of 195 in a 30-day period, DX 101 ¶ I.3, and he was allowed to refuse any orders in excess of 175 in a 30-day period for his contract in Western North Carolina, DX 102 ¶ I.3.  Each contract obligated the government to purchase at least 175 closings from each offeror within the contractual term of six months.  *See, e.g.,* DX 97 ¶¶ B.1, B.3.

On May 16, 2011, the HUD contracting officer wrote to Trust Title demanding $560,176.00 for estimated excess reprocurement costs, based on the difference between Trust Title's prices and those of the replacement contractors.  DX 23 (HUD's Demand Letter).  She also demanded the payment of liquidated damages for the late wire transfers.  *Id.* at 2.  The government's counterclaim against Trust Title seeks $758,221.00 for actual excess reprocurement costs and $14,007.65 in liquidated damages for late wire transfers.  Def.'s Post-Trial Br. at 54.

---

[15]Initially Ms. Barbee awarded a seventh contract to the O'Brien Law Firm ("O'Brien"), Trust Title's predecessor, for Western North Carolina, but O'Brien rejected the contract because the estimated quantities, as shared among three other awardees for Western North Carolina, did not make the contract worthwhile for it.  Tr. 931:1-8 (Barbee).

[16]J.E. Thornton was to receive $500.00 for every in-house closing and third-party closing in Eastern North Carolina, DX 97 at 4, and $400.00 for every in-house closing and third-party closing in Western North Carolina, DX 99 at 4.  Peter Chastain contracted to receive $400.00 for every in-house closing and $375.00 for every third-party closing in Western North Carolina.  DX 98 at 4.  Donato & Grewal was to receive $575.00 for every in-house closing and $450.00 for every third-party closing in Eastern North Carolina.  DX 100 at 4.  Dale Fussell agreed to receive $375.00 for every in-house and third-party closing in Eastern North Carolina, DX 101 at 4, and $350.00 for every in-house and third-party closing in Western North Carolina, DX 102 at 4.

## II. TRUST TITLE'S PERFORMANCE

At issue in this case is whether any of Trust Title's performance deficiencies were excusable, *i.e.*, whether they were due to causes beyond its control or attributable to HUD's actions.

### A. Timeliness of Closings

The government asserts that Trust Title was improperly staffed and was not fully ready to begin performance upon receipt of the contractual award. As a result, the government contends that Trust Title failed to perform closings in a timely fashion. Trust Title responds that HUD's actions and inactions prevented Trust Title from being in a position to perform. At trial, the government listed the cases assigned to Trust Title for closing, when those cases closed, and when wires of proceeds were sent to HUD. *See* DX 90; *see also* DX 227, DX 228, DX 229, and DX 230 (separating cases by contract and type of closing, *i.e.*, in-house or third party).[17] The exact number of cases ultimately assigned to Trust Title and closed by Trust Title was disputed. HUD's listing reflects that 1084 cases were assigned to Trust Title, DX 90, but Mr. Gardner testified that Trust Title was assigned 1031, *see* PDX 441. The parties similarly differed slightly over exactly how many cases Trust Title closed. Mr. Gardner testified that Trust Title closed 497 cases, *see* PDX 441, while the government asserts that Trust Title closed 496, Def.'s Post-Trial Reply Br. at 3, ECF No. 159. The court need not determine with specificity the exact number of cases assigned to or closed by Trust Title. The record shows that Trust Title was unable to keep up with assigned closings. Notably, Trust Title does not assert that it timely performed assigned closings.

#### 1. Staffing.

The contract required Trust Title to open and staff a local office within the geographic area covered by each contract. In its proposals, Trust Title represented that it would open offices in Charlotte and Raleigh. DX 3 at 10; DX 4 at 10. The proposals represented that each local office would have seven full-time employees almost exclusively dedicated to work on the HUD contracts. DX 3 at 10; DX 4 at 10. Trust Title did open offices in both Raleigh and Charlotte, although those offices took some time to set up. For "several weeks" until an office was organized in Charlotte, Ms. Cindy Radabaugh, a Trust Title employee in that office, testified that she was working out of the kitchen of Trust Title's Vice Chairman. Tr. 280:22 to 281:3 (Radabaugh). Once operational, neither of Trust Title's offices achieved the level of staffing projected in its proposals, even though the proposals listed the qualifications of specific

---

[17]The information was compiled from HUD's SAMS database. SAMS, which stands for single-family assets management systems, was HUD's system for recording asset transactions. SAMS kept records on cases from acquisition to reconciliation (sale). Tr. 91:13 to 92:7 (Jackson). Trust Title argued at trial that the "date closed" date on the spreadsheet could be inaccurate because it merely reflected the date the HUD-1 was signed and did not reflect when all of the tasks required to complete a sale were completed, such as recordation of the deed. Tr. 102:9 to 103:25 (Jackson); *see also* PDX 441 (summarizing Mr. Gardner's testimony about differences between HUD's analysis of assigned cases and Trust Title's).

employees who would be working on the contract as well as their resumes.  DX 3 at 12-24 & App. (Resumes); DX 4 at 12-24 & App. (Resumes).[18]  Several specifically named key personnel never were hired by Trust Title.

The East contract noted that a specific attorney would serve as "Contract Manager-Attorney" in the local Raleigh office and would devote 90% of his time to the HUD contract. DX 16 ¶ 13.  Trust Title expected that the named attorney would provide the necessary legal supervision of the office.  Tr. 419:1-6 (Gardner).  Mr. Gardner acknowledged that the attorney was never hired, and that the Contracting Officer was never informed of this.  Tr. 376:21 to 378:20 (Gardner).  Mr. Gardner also testified that Trust Title never hired five other people identified in its East proposal, including an alternate contract manager, two closing agents, a pre-closing processor, and a post-closing processor, all of whom were specifically named and were expected to devote 90% of their time to the HUD contract.  Tr. 378:25 to 379:21 (Gardner). Trust Title never informed HUD that it had not hired those people.  *Id.*[19]

On the West contract, Trust Title never hired the identified contract manager or three other employees who were to perform closing services in the local Charlotte office, all of whom were to dedicate at least 90% of their time to the HUD contract.  Tr. 381:20 to 382:11 (Gardner); *see* DX 15 ¶ I.13.  According to Mr. Gardner, four employees were ultimately hired to work full-time in the Charlotte office: Cindy Radabaugh, Dorothy Swint, Mark Vesich, and Chaz Seale. Tr. 389:21 to 391:2 (Gardner); *see also* Tr. 282:12-16 (Radabaugh) (testifying that Mr. Vesich was only there briefly).[20]  Mr. Dale Fussell, a North Carolina attorney who represented buyers of HUD properties in approximately 10-20 closings while Trust Title was conducting closings for HUD, Tr. 525:10-16 (Fussell), testified that at first everything seemed to go smoothly with Trust Title, but "it seemed to kind of go bad quickly," Tr. 526:3-14 (Fussell).  Mr. Fussell was able to get about five to ten of his closings done relatively smoothly, Tr. 529:15-19 (Fussell), but by

---

[18]The proposals noted that some of the named "employees" had gone through multiple interviews, but had yet to undergo standard background checks.  This suggests that they were technically not yet "employees" of Trust Title.  *See* DX 3 at 11.

[19]The contract required that "[p]rior to diverting any of the specified individuals to other projects, the contractor shall notify the [c]ontracting [o]fficer reasonably in advance and shall submit justification (including proposal substitutions) in sufficient detail to permit evaluation of the impact on the program.  No diversion shall be made by the contractor without the written consent of the [c]ontracting [o]fficer."  DX 15 ¶ I.13(b).

[20]On September 10, 2010, Mr. Seale, Trust Title's Vice Chairman, sent an e-mail to Mr. Gardner asking "How do we handle closings, especially any full closings, when our staff walks out?  I can't do them.  *Can we get anyone in Charlotte immediately to help people in need?*"  PX 352 (emphasis in original).  In another e-mail Yvonne Moskey, Trust Title's Vice-President of National Operations, sent a message to Mr. Gardner on September 22, 2010, asking him about hiring additional staff and whether they should be paid by the hour or by file.  DX 199.  Mr. Gardner testified that he was not aware of any staff leaving as early as September 2010 and that Mr. Seale was perhaps referring to a future time when staff might walk out.  He specifically may have been referring to Mr. Vesich.  Tr. 407:1-7 (Gardner).

"September-October it . . . seemed to just die and became extremely difficult to get anything accomplished."  Tr. 528:15-16 (Fussell).  In his view, "it seemed like they just didn't have enough people working.  As far as I could tell in Charlotte they had Cindy Radabaugh, who I dealt with quite a bit, and they brought Chaz Seale in I think the second month, and he was there only briefly.  And then the beginning of October he left; said he was going to Florida and wouldn't be back, and I never saw or heard from him again. . . .  I never had dealings with anybody except Cindy [in the Charlotte office]."  Tr. 526:17 to 527:3 (Fussell).[21]

Ms. Radabaugh also attributed Trust Title's performance deficiencies to a lack of personnel.  Tr. 283:4-10 (Radabaugh) ("[T]here wasn't the ability to do some of the things that I knew were required [in the contract] because of the manpower issue.").  Ms. Radabaugh testified that closings were not occurring due to delays in getting the title search information.  Tr. 298:11-13.[22]  She testified that Trust Title had three abstractors,[23] Shaunta Staples in Charlotte, Yolanda

---

[21]Mr. Fussell dealt with about seven or eight different people with Trust Title during this time, but except for Mr. Seale and Ms. Radabaugh, the others appeared to him to be located in Florida or Virginia.  Tr. 530:9-16 (Fussell).

[22]Trust Title asserts that some of its difficulties in performance, including difficulties in conducting timely title searches, were attributable to its lack of access to a computer-based system identified as "P260" in the contract.  The contract defines P260 as "[a]n internet based system that will serve as the primary system of record for all REO case management transactions.  This system will assign each HUD-owned property for [v]endors to track the disposition activity from conveyance to sale."  DX 15 at 11.  P260 was never made available to Trust Title during the course of its performance.  Tr. 659:23 (Gardner).  According to Trust Title, the government's failure to supply P260 made it impossible for Trust Title to perform at the speed and price specified in the contract.  Pl.'s Post-Trial Br. at 32-33.  Access to P260 "would have prevented errors and resolved many title issues, expedited the process of communication with all parties, and resolved the issues in a more efficient manner," and "in its proposal, [Trust Title] relied on its ability to access and receive training on P260."  Compl. ¶¶ 41-42.  According to Mr. Gardner, all foreclosures had prior title policy information available, and he expected it to be readily available on P260 for each of the properties assigned to Trust Title for closing.
        Mr. Fussell, a contractor currently performing closing services for HUD in North Carolina, uses P260 and testified that the system contains documents such as the sale contract, the prior title package done by the foreclosing attorney, the foreclosed deed of trust, and any HUD appraisals.  Tr. 601:21-25 (Fussell).  In Mr. Fussell's view, P260 was not a tool they used very often, but it was helpful to be able to pull a title package from a foreclosing attorney and get a prior title policy if his team could not find it.  Tr. 602:14-18 (Fussell).  While the prior title information was useful, the contract required the closing agent to perform a 30-year title search regardless of whether a prior title policy had been located.  Tr. 603:3-14 (Fussell).  In a non-HUD closing, a prior title policy is more valuable because the buyer can often get a new title policy from the previous insurer at a preferred rate and without completing a full title search.  Tr. 532:14 to 533:15 (Fussell).
        The government contends that the contract never made any affirmative representations regarding the usefulness of P260 to the contractor or regarding the types of documents that would be available on P260.  Def.'s Mem. of Contentions of Fact and Law at 35, ECF No. 109.

Powell in Raleigh, and a third woman in Raleigh whose name she could not remember at trial. Tr. 298:24 to 299:3 (Radabaugh). In addition, she recalled an examiner, Dawn Chitwood, who was responsible for compiling all of the search information into a format usable at a closing. Tr. 299:5-13 (Radabaugh). Due to difficulty in getting title-search information, Trust Title began suggesting that potential buyers hire their own counsel who could perform a title search. Tr. 301:10 to 302:2, 307:15-19 (Radabaugh) ("We did ask buyers' attorneys for their title searches, yes.").[24] Ms. Radabaugh testified that some lawyers would initially refuse to share their title search information, but would later send it to Trust Title to facilitate a closing. Tr. 315:14-25 (Radabaugh). Mr. Fussell corroborated Ms. Radabaugh's testimony, stating that Trust Title shared with him that they were having trouble getting title work done, and to facilitate his client's closings, Mr. Fussell shared his title work with Trust Title. Tr. 527:4-12 (Fussell).[25]

Mr. Gardner asserted that Trust Title was unable to hire the employees identified in its contracts because of the delays in the beginning of contract performance. Tr. 390:17 to 391:2, 650:21 to 651:4 (Gardner). To compensate for understaffed offices in Raleigh and Charlotte, as well as the surge of cases at the beginning of performance, Trust Title reassigned certain employees to the HUD contract who were physically located in offices in Florida and Virginia. *See* Tr. 458:17 to 459:6 (Gardner).

Access to legal services became particularly problematic for Trust Title during the course of its performance. In addition to representing that its contract manager for the West contract was going to be an attorney, Trust Title had advised in its proposals that it was going to hire another North Carolina attorney as a consultant on both contracts. DX 16 ¶ I.13; DX 15 ¶ I.13. Mr. Gardner testified that Trust Title had a verbal agreement with that attorney, but ultimately never retained the attorney. Tr. 380:19 to 381:4 (Gardner). Mr. Gardner further stated that when Trust Title represented in its proposals that it had contracted with a Charlotte law firm with

---

In fact, the contract only specified that the contractor was to upload completed closing packages into P260. *See* DX 15 ¶ C.5.5.4.

The unavailability of P260 does not excuse Trust Title's obligations under the contract. Trust Title did not state its reliance or expectations regarding P260 in its proposal and the solicitation did not make any representations regarding efficiencies that could be achieved through the use of P260. Moreover, Trust Title had never used P260 prior to receiving the contract. Tr. 261:16-21 (Gardner). Nonetheless, Trust Title's performance was at least hampered by its inability to gain access to and use P260.

[23]An abstractor performs the actual title search, and an abstract of title is a summary of those search results. Those search results are then translated to a formal title opinion, which must be performed by a lawyer in North Carolina. *See* 537:24 to 538:11 (Fussell).

[24]This was true even though Trust Title was contractually obligated to perform a 30-year title search, later a 10-year title search with HUD's permission, see Tr. 900:5-12 (Barbee), even for third-party closings, *see* Tr. 302:19 to 303:2 (Radabaugh); Tr. 1023:23 to 1024:1 (Seale).

[25]Aside from his dealings with Trust Title, Mr. Fussell has never shared his title work with a title company or attorney representing a seller. Tr. 534:23 to 535:3 (Fussell).

"extensive relationships with all the major lenders" in western North Carolina, DX 3 at 33, the reference was probably to that attorney's law firm. Tr. 381:5-9 (Gardner); *see also* DX 4 at 33 ("We also have contracted with a Raleigh law firm with extensive relationships with all major lenders in Eastern North Carolina."). The "verbal agreement" that Trust Title had with the attorney apparently did not contemplate the payment of money for her legal services; rather, the attorney would perform services in exchange for the opportunity to have access to potential clients. *See* Tr. 384:4-16 (Gardner). On July 1, 2010, the day the contracts were originally to go into effect, Mr. Seale responded to an e-mail from that attorney, thanking that attorney for their communications and explaining that "[w]e [Trust Title] were awarded the bid this week and are reviewing the extremely tight financial expenditures that are allowed, along with a new evaluation of all procedures." DX 233. Mr. Gardner recalled meeting with the attorney during the stop-work-order period after receiving the contract, but at that point in time already knew they were not going to hire the attorney. Tr. 427:2-22 (Gardner). He testified that Mr. Seale had told him the attorney's business had picked up and would not have as much time to devote to the contract. Tr. 427:6-10 (Gardner).

When Trust Title failed to retain either of the attorneys it named in Raleigh, it began looking for other lawyers willing to provide services at a price it could afford. *See* Tr. 430:9-14 (Gardner). On July 10, 2010, one of the attorneys it was considering had informed Trust Title, in an e-mail to Mr. Seale, that "[t]he attorney giving an opinion on title cannot be an owner or employee of the title insurer issuing the title insurance. . . . An easy solution is employing, say on a contract basis, an outside attorney to review title and sign off on title opinions." DX 121. Accordingly, it appears that Trust Title could not have directly employed a lawyer who could provide opinions on title because Trust Title wanted also to be able to sell title insurance to buyers. *See* Tr. 357:16 to 358:1 (Gardner) (testifying that Trust Title expected to sell title insurance to at least some buyers); *see also* Tr. 419:24 to 420:11 (Gardner). Mr. Gardner testified that he was aware of this limitation before contracting and that it was not the reason Trust Title failed to hire the attorney it had considered to head the Raleigh office. Tr. 419:24 to 421:11 (Gardner). The principally considered lawyer, Mr. Gardner testified, wanted to maintain his law practice and provide contract management to Trust Title, and this was something Trust Title learned after contracting with HUD. Tr. 421:20 to 422:4 (Gardner). Trust Title interviewed one other lawyer to serve as a contract manager, but chose not to hire him. Tr. 422:5-21 (Gardner).

On July 19, 2010, Peter Chastain, the Managing Attorney for Peter Chastain & Associates, P.A., a North Carolina law firm, e-mailed Mr. Gardner to suggest that his firm might perform closing services for Trust Title on the HUD contract. Mr. Chastain explained,

> We would very much like to assist your firm in servicing your newly
> awarded contract in NC or in aiding you in getting started. Your firm will
> need to service this contract through a law firm established by you or with
> assistance from a firm licensed to practice law in NC. This is an attorney
> state, not a title state. When HUD mistakenly awarded this contract to
> "Lakeside Title" in Cleveland, OH in 2005, they soon found their error

> and required Lakeside to start a law firm which turned into "The O'Brien
> Law Firm."  It would seem your firm is now in this same conundrum.

DX 122.  Mr. Chastain further explained that his firm had subcontracted with Trust Title's predecessor, O'Brien, to help them perform closings.  *Id.*  Trust Title discussed a potential subcontracting arrangement with Mr. Chastain, but ultimately did not pursue it, in part because Mr. Chastain wanted $175 per closing for his services.  Tr. 425:15-25 (Gardner).  Trust Title engaged in discussions with still another North Carolina firm but was unable to reach a financially feasible agreement with them.[26]

Overall, it appears that Trust Title was attempting to implement a business model whereby attorneys would perform free or low-cost legal services for Trust Title in the hopes of gaining other business.  *See* DX 193 (E-mail from Seale to Gardner (Aug. 1, 2010)); *see also* Tr. 437:22 to 444:4 (Gardner).  Mr. Seale explained to Mr. Gardner that any significant law firm would be unlikely to be interested in

> los[ing] money in hopes of some business.  (I'm also still concerned
> that without the monetary benefit that our 'preferred' firms won't get
> the business.) . . . There's a lot to work out with [name omitted], or any
> primary firm, and with any other firms that we want as 'preferred[.']

---

[26]One of the principals of that firm wrote in an e-mail to Mr. Gardner on August 4, 2010,

> I feel as if we are still beating the same dead horse:

> We either supervise [Trust Title] in the representation of HUD in all 100
> counties in the same fashion we represent our current REO clients, which
> means that we pull title, prepare deeds, and answer questions of third[-]
> party attorneys, for a reasonable fee (which will deplete your entire seller
> side), [or] anything less falls short of proper supervision as required by
> State Law.

> As for the buyer[']s side we are happy to draft deeds and share title in our
> closings where we are supervising the moving parts, and we will do our
> best to patronize your title company, with HUD and non-[HUD] closings.
> As we all know it[']s up to the borrower, and what is in the borrower[']s
> best interest.

> Unfortunately, I understand your position, and I am sure these terms are
> not financially sound for your company.  I appreciate the time to try and
> work this out, however after four hard days of talking and negotiating . . .
> we are still too far apart on what we need to make this work. . . .

DX 26.

16

> And with business potentially beginning Monday our 'preferred' lawyer strategy will be difficult to have in place.

DX 193. Mr. Gardner emphasized at trial that the "preferred lawyer strategy" was merely a strategy that was discussed and not a "policy." Tr. 435:25 to 436:1 (Gardner). That said, Wayne Roper, a lawyer eventually hired by Trust Title, did not charge a fee for supervising title searches or providing attorney opinions of title in exchange for being referred by Trust Title to buyers interested in buyer's-side counsel. Tr. 437:22 to 438:18, 439:4-7 (Gardner) (explaining that the goal of the preferred lawyer strategy was "[t]hat the real estate agent would be favorably impressed with the efficiency and want to do business with Wayne Roper, not just on HUD properties, but other properties."); *see also* DX 194 at 6 (E-mail from Moskey to Gardner (Aug. 5, 2010)); Tr. 502:14 to 503:7 (Gardner). Trust Title and Mr. Roper ultimately hoped that their closing process would be so smooth that realtors would start directing business to the lawyers referred by Trust Title. Tr. 442:8 to 443:6 (Gardner). Mr. Gardner acknowledged that Trust Title's business model was predicated on lawyers agreeing to this type of arrangement. Tr. 444:2-6 (Gardner). Mr. Roper eventually sought to discontinue his relationship with Trust Title around September 22, 2010, but he continued doing some work as a courtesy to Mr. Gardner. Tr. 449:15-21 (Gardner). *But see* DX 198 (E-mail from Susan Stoakes to Seale (Sept. 22, 2010) ("Wayne is no longer approving deeds.")). Trust Title entered into an arrangement with another attorney, John Hazlehurst, on or about September 29, 2010, whereby Trust Title would pay him $150 to provide attorney opinions of title and $250 for Good Neighbor Next Door closings, but nothing for deed preparation. DX 128 (E-mail from Gardner to Hazlehurst (Sept. 29, 2010)); *see also* Tr. 450:20 to 451:3, 451:24 to 452:16 (Gardner). At the end of September or the beginning of October, Trust Title also asked Mr. Fussell to do title searches, provide attorney opinions of title, and perform deed preparation or review, for which they paid him $125 per closing, which was far below the normal $350 he would charge for such services. Tr. 535:21 to 536:9 (Fussell). Trust Title eventually stopped paying Mr. Fussell for his work near the middle or end of October, at which time he was still owed about $3,000. Tr. 539:11-20 (Fussell).[27] Paying these rates for legal services essentially eliminated Trust Title's ability to perform closings for $224 and $225.

By the end of October 2010, only one person was left in Trust Title's Charlotte office, and Trust Title was having difficulty paying its staff. *See* DX 82 (Spreadsheet Summarizing Unpaid Payroll for Q3 and Q4 2010). Mr. Seale had packed up his desk and left the office on October 27, 2010, the same day that Trust Title had its meeting with HUD after receiving the show-cause letter. Tr. 396:2-22 (Gardner); *see also* DX 211 (E-mail from Chitwood to Moskey and Gardner (Oct. 27, 2010)). Mr. Gardner testified that HUD had made it "very clear" at the meeting on October 27, 2010 that the contract was going to be terminated. Tr. 397:7-9 (Gardner). After October 27, 2010, only one employee in the Raleigh office could perform closings, and she was working primarily from home. Tr. 398:11-23 (Gardner). Ms. Radabaugh testified that she, Ms. Swint, and Ms. Staples had not been paid for the month of October, and

[27]In early or mid-October Trust Title asked Mr. Fussell if he wanted to take over its contract with HUD, but Mr. Fussell declined because the price HUD was paying Trust Title for each closing was too low to make it worthwhile for him and he was concerned about the state of the contract by that point. Tr. 548:16 to 549:9 (Fussell) ("It just looked like a sinking ship, and I wasn't going to jump on.").

when she confronted Mr. Gardner about that fact at the end of October and did not receive a satisfactory response, she quit.  Tr. 337:3 to 338:5 (Radabaugh).[28]  Ms. Swint quit at the same time, leaving Ms. Staples alone in the Charlotte office, even though she was unable to perform closings.  Tr. 338:6-19 (Radabaugh).  Ms. Radabaugh believed that at that time Jonathan Dees had already left the Raleigh office, leaving Ms. Powell as the only remaining employee in Raleigh.  Tr. 338:20-25 (Radabaugh).  By November 15, 2010, Trust Title owed $51,239.91 in unpaid wages to its employees, with about $45,000 of that amount accruing in October and November 2010.  DX 82.  At the time of trial, Trust Title still owed some unpaid wages to its former employees.  Tr. 411:9-12 (Gardner).[29]

  2.  *Volume of work.*

  According to Trust Title, it received an unreasonably large number of cases within the first month of contract performance.  The high volume was due to the month-long delay in performance, during which time buyers continued to sign contracts that could not be ratified by HMBI or closed because no firm could perform closing work for HUD.  This hiatus in closings occurred at the busiest period of the year for real estate sales and at a time when the housing market had begun to recover somewhat and HUD had a large number of foreclosed properties on its books that it was endeavoring to sell.  The government recognized that contracts piled up in July while Trust Title could not perform any closings.  Tr. 62:15-19 (Jackson); *see also* Tr. 395:17-22 (Gardner).

  Trust Title asserts that it had a start-up plan that contemplated having 30 days from receipt of initial cases to produce settlements, but "HUD destroyed Trust Title's start[-]up plan by dumping, in the first 30 days, over 540 cases on Trust Title. . . . From the first day of contract performance, Trust Title was confronted with completely unanticipated work – attempting to mollify highly agitated buyers, real estate brokers and attorneys who did not understand the basis of Trust Title's contract with HUD – and that HUD had accumulated a huge backlog of stale cases."  Pl.'s Mem. of Contentions of Law and Fact ¶¶ 6, 8, ECF No. 100.

  The contracts were requirements contracts pursuant to FAR § 52.216-21.  Accordingly, the contracts did not specify a number or schedule of closings throughout the duration of the contract.  DX 15 ¶ I.4.  Rather, Trust Title would receive an "order" for closing services when Trust Title received a new case ID number in HUD's SAMS or P260 system.  *Id.* ¶ I.6.  The contracts estimated that Trust Title would receive 1800 in-house closings and 540 third-party closings per contract per year, for a total of 2340 closings per contract per year.  *Id.* at 4.  Thus, Trust Title was estimated to receive 195 closings per contract per month.  Trust Title was to be paid upon completion of a closing.  As previously noted, the contracts permitted Trust Title to reject any orders for closing services beyond the 195 monthly estimate.  *Id.* ¶ I.3 (incorporating

---

[28]Ms. Radabaugh eventually received her unpaid wages.  Tr. 339:20-22 (Radabaugh).

[29]In addition to having difficulty paying its staff, Trust Title appeared to also have problems paying abstractors it hired to run title searches.  Tr. 635:21 to 638:1 (Gardner).  By the end of October, both East Coast Abstracting and Fidelity would no longer accept orders from Trust Title.  *Id.*

FAR § 52.216-19).  To reject any orders in excess of 195 within a 30-day period, the contract required Trust Title to reject the excessive orders within three days of receiving them with written notice to the contracting officer that it did not intend to fulfill the orders.  *Id*. ¶ I.3(d). Upon receiving such notice, the government was free to acquire services from someone else.  *Id.* Trust Title was aware of its ability to reject orders in excess of 195, but it never exercised it.  Tr. 387:21 to 388:24 (Gardner); Tr. 890:19 to 891:19 (Barbee).[30]

The cases Trust Title received during the first month of contract performance were about evenly split between the West and East contracts.  Tr. 897:20-23 (Barbee).[31]  Mr. Gardner testified that Trust Title received contracts from HMBI that had been signed by buyers, though not ratified by HMBI, as far back as May 2010, though only a few were signed in May 2010. *See* PDX 448 (reflecting Mr. Gardner's testimony that Trust Title received 55 contracts that had been signed by buyers prior to July 1, 2010).  It appears that once Trust Title was able to begin performance, HMBI quickly ratified the contracts that had been signed by buyers in July and passed large numbers of contracts on to Trust Title for closing.  *See* Tr. 63:2-8 (Jackson).  Trust Title was still entitled to the full 45 days to close the sales, Tr. 63:9-12 (Jackson), but for reasons that are self-evident, buyers were anxious to close, *see* Tr. 471:13-21 (Gardner).

Trust Title never rejected any orders even though it was not obligated to accept any orders in excess of 195 in a 30-day period on a single contract.  Tr. 388:7-19 (Gardner).  In fact, on August 24, 2010, Mr. Gardner sent an e-mail to Ms. Barbee, stating that "we have restructured our operations to add significant additional resources to help clear the backlog and to enhance HUD's reputation in the marketplace."  PX 110 at 1.  Moreover, Mr. Gardner expressed his belief in a conference call with HMBI that at one time he believed Trust Title would be able to handle the initial surge in volume.  DX 104 at 9:15-18 (Transcript of Conference Call Between HMBI and Trust Title).  He also acknowledged that "[Trust Title] should've taken different measures than [it] did up front."  *Id*. at 10:14-16.

---

[30]Although the government asserted that HUD was obligated to use Trust Title for all of its closing services needs in North Carolina unless Trust Title rejected any orders, *see* Def.'s Post-Trial Reply Br. at 13; *see also* Tr. 388:25 to 389:3 (Gardner), the contract appears to state otherwise, *see* DX 15 ¶ I.3(c) (citing FAR § 52.216-19(c)).  The contract provides, "Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule."  DX 15 ¶ 1.4(c) (incorporating FAR § 52.216-21).  The immediately preceding paragraph, however, states, "If this is a requirements contract . . . the Government is *not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations in paragraph (b) of this section*."  *Id.* ¶ 1.3(c) (emphasis added).  Thus, the contract appears to have permitted the government to discontinue assigning closings in excess of 195 in a 30-day period per contract, but it did not require the government to do so.

[31]Mr. Jackson testified that HUD continued to assign closings to Trust Title's predecessor, O'Brien, until the end of June 2010.  Tr. 61:20 to 62:14 (Jackson).  According to Mr. Jackson, O'Brien was responsible for performing all closings assigned to it in June, even if the closing itself did not occur until later.  Tr. 61:22 to 62:6.

### 3. Incomplete or "piecemeal" contracts.

Mr. Gardner testified at length about the significant delays caused by the receipt of incomplete sales contracts from HMBI. He testified that approximately 25% of the orders Trust Title received in the first month of performance were incomplete, *e.g.*, missing a proper earnest-money deposit or missing certain information on the contract. Tr. 677:22-23 (Gardner). Most importantly, in Trust Title's view, earnest-money deposits were not necessarily connected to contracts HBMI had ratified, creating time-consuming and difficult work to rectify and complete the contractual documentation. *See* Tr. 688:8 to 689:19 (Gardner). Moreover, the earnest-money deposits were not necessarily in the proper form. Sometimes the earnest-money deposits were not in the correct amount, not certified, or lacking identifying information such as the purchaser name or property address. Tr. 654:1-12 (Gardner).

Trust Title's contracts with HUD only specified that the closing agent was responsible for holding earnest-money deposits, providing no further details. DX 15 ¶ C.5.2.A.2. Trust Title chose to have earnest-money deposits mailed to its office in Reston, Virginia, Tr. 1229:4-5, 1251:21-24 (Gardner), and also chose to have HMBI enter contracts in an electronic program from which Trust Title could download the contracts and load the information into Trust Title's internal tracking system. Mr. Gardner testified that by using such a system, anybody working for Trust Title, in any office, could work with the files. Tr. 1248:14 to 1249:24 (Gardner). This electronic system was supposed to increase Trust Title's efficiency. Tr. 653:3-10 (Gardner). By using such a system, however, contracts were necessarily being separated from earnest-money deposits, and Trust Title had to match earnest money with the electronically submitted contracts. Tr. 654:8-12 (Gardner). During a conference call with HMBI, HMBI questioned whether this was the best way to forward contracts to Trust Title because Trust Title could not explain why a few contracts that were loaded by HMBI could not be located in the electronic system. DX 104 at 64:14 to 66:22. Mr. Gardner also testified that at the beginning of this process, HMBI was only able to provide incomplete information about a contract. Tr. 653:11-14 (Gardner). He did not clarify if that was because HMBI had trouble submitting information electronically or because HMBI did not have the information. Trust Title never returned incomplete contracts to HMBI. Tr. 461:5-11 (Gardner).

Ms. Barbee testified that Trust Title never complained to her about the way in which it received earnest-money deposits from HMBI. Tr. 919:19-23, 920:5-8 (Barbee). Nor did Trust Title complain about receiving contracts in a piecemeal fashion from HMBI. Tr. 920:9-19 (Barbee). Additionally, Mr. Gardner testified that although he had an hour-and-a-half to two-hour conference call with HMBI on September 20, 2010, he did not address the issue of earnest-money deposits arriving separately from contracts. Tr. 1230:9 to 1231:4 (Gardner), *see also* DX 104. During this conference call, Trust Title discussed a number of work-flow issues with HMBI, but Trust Title focused on a need to receive tax information and data on homeowners' associations' fees in a more timely fashion from HMBI. DX 104 at 36:4 to 44:20.

### 4. Forms and training.

Trust Title asserts that HUD failed timely to provide or approve a form of deed, as well as documents required to complete Good Neighbor Next Door closings and a general-title

affidavit, also referred to as a seller's affidavit. Tr. 462:18-23 (Gardner). The contract required that Trust Title get approval from HUD before using its special warranty deed. Tr. 463:8-13 (Gardner). HMBI had sent Trust Title a copy of the deed it had been using. Tr. 466:1-3 (Gardner). Mr. Gardner sent the government's technical representative a copy of the deed on August 18, 2010, and she responded on August 19, 2010 that the deed was acceptable. DX 157 (E-mail from Carolyn Homan, Government Technical Representative, to Gardner (Aug, 19, 2010)); *see also* Tr. 466:1-3 (Gardner). Mr. Gardner elaborated at trial that prior to that e-mail there had been delay in trying to get the deed approved. He had asked the government technical representative where to send a deed for approval, and she had responded that deed approval was not necessary. Mr. Gardner then pointed her to the language in the contract explaining that Trust Title was required to have the deed approved and she then responded with her approval. Tr. 629:2-14 (Gardner).

Regarding the Good Neighbor Next Door documents, Mr. Gardner testified that they were initially very difficult to find, and the contracting officer eventually located them online and sent them to Trust Title. Tr. 720:8 to 722:20 (Gardner); PX 163 (E-mail from Homan to Gardner (Sept. 8, 2010)). According to Mr. Gardner, this type of problem could have been avoided by proper training. Tr. 723:7-18 (Gardner). Ms. Radabaugh, however, testified that she did not recall Good Neighbor Next Door transactions causing any serious delay for Trust Title. Tr. 329:11-14 (Radabaugh).

Trust Title also argues that the lack of formal training provided by HUD significantly contributed to Trust Title's inability to perform closings. Tr. 480:8-13 (Gardner). *But see* Tr. 293:24 to 294:1 (Q. "Do you recall any specific training that you needed?" Ms. Radabaugh. "No, not really."). The contract stated that Trust Title would be required to attend a one-day training, but it did not go into any detail regarding what that training would encompass. Mr. Gardner testified that, in his view, "any reasonable person would assume that if training is required prior to commencement of a contract, that one could assume in a contract that is involved with real estate settlements of the magnitude of this, that there would be a meeting that would discuss policies, procedures, forms, contact information, normal transition information that would be associated with any type of business of this nature." Tr. 479:14-21; *see also* Tr. 707:5-8 (Gardner) ("But the training, in our mind when we submitted our proposal, was very clearly a show stopper because . . . in boarding a client, there is a transition period."). Additionally, Trust Title did not receive its post-award conference until August 25 or 26, 2010, approximately three weeks after the contract start date. Tr. 661:21-23 (Gardner). Mr. Gardner testified that the conference was conducted by telephone and lasted about 20 minutes, which is in stark contrast to the multi-hour post-award conference received by Mr. Fussell in connection with a reprocure-ment contract. Tr. 661:1-20 (Gardner); *see also* Tr. 564:22-25 (Fussell).

## B. Wire Transfer of Funds

The contract required that Trust Title wire proceeds to HUD via SAMS no later the 2:00 p.m. the next business day following a closing. DX 15 ¶ C.5.5.2. In HUD's show-cause letter, HUD asserted that for 91% of the cases closed by Trust Title at that point in time, proceeds had not been received by HUD within the required time. DX 55 at 2. Trust Title did not dispute this finding in its response to the show-cause letter, but it asserted that the timing was due to factors

beyond its control.  DX 61 at 6 ("Trust Title has communicated the conflicts in the contract and requested and not received direction with respect to third[-]party closings.").  Overall, Trust Title failed to wire funds within one day of closing, as determined by the date on the HUD-1, in the vast majority of both in-house and third-party closings.[32]

Mr. Gardner explained that funds could only be disbursed after recording the deed, Tr. 499:16-18 (Gardner), and only cleared funds could be disbursed, Tr. 739:14-19 (Gardner).  He further testified that he was fully familiar with the laws and customs of North Carolina when he signed the contract with HUD, Tr. 500:15 to 501:2 (Gardner), yet the recording requirement for disbursement under North Carolina law created particular problems for Trust Title with third-party closings because Trust Title was reliant on the third-party attorney to record the deed promptly and then send the proceeds to Trust Title, *see* Tr. 772:8-11 (Gardner); *see also* PX 345 at 7 (a sample closing document with a receipt reflecting the recordation of a deed for a closing that had occurred six days before).

The contract contemplated that in third-party closings, the third-party attorney might be the one to actually record the deed.  *See* DX 15 ¶ C.5.3.4(f) (Trust Title was required to "[e]nsure that the deed is filed for recordation [and] [o]btain recording information/receipt from the third[-]party for submission with the complete closing package, or within 24 hours of receipt from third[-]party . . . .").  At trial, Mr. Gardner explained that a buyer would not want the seller's agent to have control over recording the deed.  Tr. 499:4-10 (Gardner).  Mr. Brian Buchanan, Trust Title's Chief Financial Officer, testified that Trust Title was unable to force third-party attorneys to complete actions, such as recording the deed or wiring proceeds, in a timely enough fashion to enable Trust Title to meet its own contractual requirements with HUD.  Tr. 870:4 to 871:19 (Buchanan).[33]  Even if a deed was promptly recorded by the third-party attorney, if Trust Title received a check, Trust Title was forced to wait a few days for the check to clear before it could wire those proceeds to HUD.  Tr. 738:16 to 740:10 (Gardner); *see also* PX 295 (E-mail from Gardner to Barbee (Aug. 24, 2010)).  Otherwise, in Trust Title's view, it was illegally borrowing against its own escrow account.  Tr. 738:16 to 740:17 (Gardner).  Thus, according to Trust Title, exchanging a deed for a check and wiring funds to HUD before ensuring the deed was recorded and the check had cleared was not possible.  Tr. 738:24 to

---

[32]The court accepts that funds could not be wired until the deed had been recorded and that a deed may not be able to be recorded precisely the same day a HUD-1 is signed.  By any measure, however, Trust Title failed to ensure that deeds were promptly recorded and funds promptly wired.  Specifically, Trust Title only wired funds within two business days of closing 9 times for in-house closings, *see* DX 227, DX 229, and 49 times for third-party closings, *see* DX 228, DX 230, or slightly less than 12% of the time.

[33]Testimony at trial suggested that Trust Title was not regularly attending third-party closings.  *See* Tr. 323:10-19 (Radabaugh) (testifying that she recalled Trust Title attending one third-party closing; Tr. 1087:7 to 1088:10 (Seale) (testifying that he tried to go to some closings but often he did not have the correct schedule or the time to attend).

740:13 (Gardner).[34]  Respecting in-house closings, where Trust Title was not reliant on a third-party attorney to record a deed or disburse proceeds, Mr. Gardner did not explain why proceeds were not wired to HUD within the time established in the contract.  *See* Tr. 641:7 to 642:4 (Gardner).  He stated that only once or twice did a lender fail to disburse funds in a timely fashion, which would have delayed Trust Title.  Tr. 642:2-4 (Gardner).

Mr. Gardner acknowledged that it was physically possible to record a deed and transfer proceeds to HUD on the same day, even for a third-party closing.  Tr. 467:6-8 (Gardner).  Wire transfers from the buyers could have solved part of the problem because wire transfers are immediately cleared funds.  *See* Tr. 467:1-2 (Gardner).  Trust Title had sent closing instructions to buyers requiring them to wire them funds no later than 11:00 a.m. the day after closing.  DX 41 at 2-3; Tr. 624:23 to 625:2 (Gardner).  Mr. Gardner testified that these instructions were enforced, and that Trust Title never asked for checks,[35] but he also acknowledged that there were occasions where they received checks.  Tr. 841:21 to 842:18 (Gardner).  *But see* Tr. 870:4 to 871:19 (Buchanan) (testifying that he did not see how Trust Title could force third-party attorneys to do anything).  The government compared recordation dates of certain deeds provided by Trust Title at trial to the dates these sale proceeds were wired to HUD and found significant delays even after recordation had occurred.  *See* Def.'s Post-Trial Reply Br. at 5.  Moreover, Trust Title's banking records, PX 343, indicate that Trust Title received wires from third-party attorneys but waited days to initiate a wire transfer to HUD, *e.g.*, PX 343 at 324 (File ID: S10I38268), 325 (File ID: 10I38315).

At trial, Mr. Fussell described how he complied with the fund-wiring requirements of his reprocurement contract.  He explained that while the HUD requirements upset some buyer-side lawyers in North Carolina, he ensured their compliance so he could comply with the terms of his contract with HUD.  He sends them a closing instruction sheet that they are required to sign and return to him.  Tr. 561:24 to 562:8 (Fussell).  He noted that "one of the sticking points is we make them wire the money to us, and they don't like doing that.  A lot of attorneys don't like to, and they can't charge a fee for it, and that really upsets them that we won't let them charge a fee for wiring the funds."  Tr. 562:9-13 (Fussell); *see also* Tr. 580:10-16 (Fussell) ("We make all buyers wire funds to us.  We make all third-party closing attorneys wire funds to us. . . .  That's the only way to [comply with the contract].").  Mr. Fussell required attorneys to wire funds by 10:00 a.m. the day after closing, and he recognized that meant a third-party attorney had to record a deed almost immediately because funds could not be wired until the deed was recorded.  Tr. 583:4-14 (Fussell).  Mr. Fussell testified that by getting the third-party attorneys to sign closing instruction sheets, he was able to threaten them with a state bar complaint if they failed to comply.  Tr. 583:15-20 (Fussell).  Moreover, if a third-party attorney proved unable to wire the

---

[34]Mr. Gardner testified that he had learned from other attorneys that O'Brien used to exchange a check for a deed on the courthouse steps and then promptly wire the proceeds to HUD, which in his view, was impermissible under North Carolina law.  Tr. 466:12-21, 679:16-22 (Gardner).

[35]Trust Title's escrow account records confirm that it was receiving wired sale proceeds from third-party attorneys on a regular basis.  DXs 173, 174 (e-mails from Gardner to Barbee (Oct. 21, 2010)).

funds on time or record on time, then he would cancel the closing and reschedule it for another day.   Tr. 589:17-22 (Fussell).  Trust Title asserts that its problems with third-party attorneys stemmed, in part, from a shift in contract requirements between its contract and O'Brien's contract.  One such issue revolved around the $5,000 credit HUD provided to buyers to help cover closing costs.  When O'Brien had the contract, that credit was permitted to cover the costs of a buyer's attorney, but Trust Title was told by its government technical representative that the credit could no longer be applied towards a buyer's attorneys' fees.  Tr. 666:14-23 (Gardner); *see also* PX 287 (e-mail from Homan to Gardner (Aug. 20, 2010)).  Predictably, third-party attorneys were disgruntled by this shift because they now had to seek and obtain fees directly from their clients.  Tr. 667:5-11 (Gardner).[36]

## DISCUSSION

### I.  TERMINATION FOR DEFAULT

The notice of default termination states that Trust Title was terminated pursuant to FAR § 52.249-8 because it "failed to provide wire transfer of funds for closings and to provide a course of action to alleviate the backlog on closings assigned to Trust Title."  DX 76 at 1.  At trial, the government asserted that Trust Title was terminated for default for failing to comply with these requirements and others, including: "1) timely disbursement of sales proceeds to the [g]overnment; 2) timely performance of closings; 3) informing HUD of reassignment of key personnel; 4) performance of 30-year title searches; 5) attendance at third-party closings; and 6) providing good customer service."  Def.'s Post-Trial Br. at 27.  Notably, "the government is not limited to the reasons [for the termination] stated in the cure notice, but may rely on any rationale

---

[36]Issues also arose as to how the HUD-1 should be prepared to accurately reflect the disbursements at closing, including the earnest-money deposit.  The buyer (or the buyer's realtor) would provide Trust Title with the earnest-money deposit.  Trust Title testified that it went back and forth with HUD over how to reflect the earnest-money deposit on the HUD-1 in a way that satisfied HUD and Trust Title's interpretation of RESPA.  HUD did not want to "show that earnest[-]money deposit on the seller's side [because] they want to be able to look in one place on a settlement statement, which is down in the bottom number, proceeds to the seller . . . . And they want that number to match SAMS because that will be their audit."  Tr. 682:4-9 (Gardner).  Trust Title ultimately decided to wire back the earnest-money deposit to the third-party attorney who would then wire the entire sale proceeds to Trust Title at the time of closing.  Tr. 681:13-24 (Gardner), *see also* PX 278 at 2 (E-mail from Gardner to Hunter Edwards, Attorney with Brady & Kosofsky (Sept. 7, 2010)), 9-11 (E-mail from Hardy, HMBI, to Moskey (Sept. 8, 2010)).

This solution appears to be in contrast to that chosen by Trust Title's predecessor.  Dale Fussell testified that O'Brien had handled earnest-money deposits by showing the earnest-money deposit previously sent to the closing agent as a credit to the buyer on the HUD-1, and then when money was sent to the closing agent to complete the sale, the money was reduced by the amount of the earnest-money deposit.  Tr. 549:10-23 (Fussell).  Mr. Fussell testified that such a tactic complied with RESPA because all parties were receiving their funds in exactly the way the HUD-1 reflected.  Tr. 551:2-18 ("[D]isbursing funds that somebody's holding, less money that they're holding already[,] is not a RESPA violation.").

justifying the default termination decision based in facts that existed at the time of termination." *Liquidating Tr. Ester Du Val of KI Liquidation, Inc. v. United States*, 116 Fed. Cl. 338, 383 (2014) (citing *Empire Energy Mgmt. Sys, Inc. v. Roche*, 362 F.3d 1343, 1357 (Fed. Cir. 2004); *Joseph Morton Co. v. United States*, 757 F.2d 1273, 1277 (Fed. Cir. 1985)).

### A.  Legal Standards

The government bears the burden of proof and must show, by a preponderance of the evidence, that the decision to terminate the contract for default was justified. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 764 (Fed. Cir. 1987). Courts are averse to default terminations, but nonetheless the court must "strike a balance between [this aversion] and the fact that 'the [g]overnment, just as any other party, is entitled to receive that for which it contracted.'" *5860 Chicago Ridge, LLC v. United States*, 104 Fed. Cl. 740, 745-55 (2012) (quoting *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1015 (Fed. Cir. 2003)). To prevail, "[t]he government . . . must establish that the default termination was based on 'good grounds and on solid evidence.'" *Id.* at 755 (quoting *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969)). "A court's review of a default justification does not turn on the contracting officer's subjective beliefs, but rather requires an objective inquiry." *McDonnell Douglas Corp. v. United States*, 567 F.3d 1340, 1355 (Fed. Cir. 2009) (quoting *McDonnell Douglas*, 323 F.3d at 1016), *vacated on other grounds, General Dynamics Corp. v. United States,* __ U.S. __, 131 S.Ct. 1900 (2011). That inquiry may incorporate a determination whether the contracting officer properly concluded "that there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract performance." *McDonnell Douglas*, 567 F.3d at 1346 (quoting *Lisbon Contractors*, 828 F.2d at 765) (internal citations and quotations omitted).

The contracts at issue here incorporated a default termination clause, FAR § 52.249-8, *see* DX 15 ¶ I.1, which provided that the government could terminate the contract if Trust Title failed to (i) deliver the supplies or perform the services within the time specified in the contract, (ii) make progress, so as to endanger the performance of this contract, or (iii) perform any of the other provisions of this contract, FAR § 52.249-8(a)(1)(i)-(iii). FAR § 52.249-8 requires the contracting officer to provide the contractor with notice of the possibility of termination and a ten-day period to make improvements. FAR § 52.249-8(a)(2). The inclusion of this default-termination provision does not negate the applicability of common law concepts to government contracts, but it can lessen the government's burden in justifying a termination for default. The government "may terminate a contract for default based upon the specific terms of the contract, even if the failure giving rise to that default is not a 'material breach' under the common law," provided that the failure giving rise to the default termination is specifically noted as a ground for termination in the contract's provisions. *5860 Chicago Ridge*, 104 Fed. Cl. at 756 (citing *Kelso v. Kirk Bros. Mech. Contractors, Inc.,* 16 F.3d 1173 (Fed. Cir. 1994)). If, on the other hand, the failure relates only to "other provisions of th[e] contract" and is not specifically cited as a ground for default termination, *see* FAR §52.249-8(a)(1)(iii), the court may require that the alleged failure constitute a material breach. *5860 Chicago Ridge*, 104 Fed. Cl. at 756.[37]  For

_____

[37]As the court noted in *5860 Chicago Ridge*, to find otherwise would render default provisions "mere surplusage."  104 Fed. Cl. at 757 ("To give those default clauses some

example, in *5860 Chicago Ridge*, the court held that the government was not required to show it had been constructively evicted from a property to prove that it had properly terminated a lease for default by the lessor if the government could show that the lessor failed to satisfy a particular contractual provision that the contract specifically noted could give rise to a termination for default. *Id.* at 757-59.  Here, HUD's assertions that Trust Title was not timely wiring funds and had not provided an acceptable plan to alleviate the backlog of cases presumably fall under FAR § 52.249-8(i) and (ii), *i.e.,* failure to perform the services within the time specified in the contract and failure to make progress, respectively.  Plainly also, the requirements to perform closings and to wire funds within the time specified in the contract are material elements of the contract.

Moreover, in a case such as this one, where there is no single product delivery date or the equivalent, "the court must examine other factors, including the contractor's failure to meet progress milestones, its problems with subcontractors and suppliers, its financial situation, and its performance history. . . .  Only after analyzing the totality of the circumstances can a court determine whether a contractor failed to '[p]rosecute the work so as to endanger performance' of the contract." *Armour of Am. v. United States*, 96 Fed. Cl. 726, 745-46 (2010) (alteration in original) (quoting *McDonnell Douglas,* 567 F.3d at 1348, 1350-51), *appeal dismissed*, 430 Fed. Appx. 895 (Fed. Cir. 2011)).  If the government meets its burden of justifying the default termination, the contractor can rebut such a finding by showing excusable delay.  *See Lassiter v. United States*, 60 Fed. Cl. 265, 268 (2004) ("Because the defendant satisfied its burden of proof, plaintiff is required to demonstrate that his nonperformance was excusable.") (citing *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996)); *see also* FAR § 52.249-8(g) ("If, after termination, it is determined that the [c]ontractor was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the [g]overnment.").

### B.  Propriety of Termination

The evidence at trial showed that Trust Title continuously failed to disburse sales proceeds to HUD in a timely manner.  *See supra*, at 22-24.[38]  Both the cure notice and the show-cause letter alerted Trust Title to the gravity of this deficiency.  By signing the contracts, Trust Title had agreed to wire funds to HUD by 2:00 p.m. the next banking day after closing.  Trust Title inflates the importance of the prohibition on "table funding" in North Carolina.  *See* Pl.'s Post-Trial Br. at 35-37.  Trust Title was not terminated for a failure to disburse funds at the precise time the HUD-1 was being signed by the buyers at the "table."  *See* DX 76; *see also* Def.'s Post-Trial Reply Br. at 9.  Trust Title was terminated for failing to wire funds by 2:00 p.m. the next banking day after closing, which it acknowledged was technically possible, albeit difficult.  Trust Title's explanations at trial for why it could not force third-party attorneys to

---

meaning, one must conclude that while defendant may, upon the occurrence of a material breach, terminate the contract either under the default clause or the common law, it may also invoke specific clauses in the contract that authorize default upon particularized failures without having to show that such failures constituted a material breach.").

[38]Trust Title's blanket assertion to the contrary in its post-trial brief is without citation to the record.  *See* Pl.'s Post-Trial Br. at 39.

record deeds or disburse funds in a sufficiently timely manner to allow Trust Title to comply with its contracts with HUD does not excuse it from its contractual obligations.  In some ways Trust Title was responsible for its problems with third-party attorneys, or at the very least responsible for exacerbating those problems because it did not often send a representative to such closings.  Perhaps more importantly, however, Trust Title failed promptly to wire funds for in-house closings or for third-party closings for which it had received wire transfers from third-party attorneys.

Trust Title asserted that it was familiar with North Carolina's banking and real estate regulations and presumably understood that the cooperation of attorneys would be required for third-party Trust Title closings.  Trust Title's instructions that it sent to third-party attorneys, which required a timely wiring of funds to Trust Title the day after closing, reflected that need.  *See supra*, at 23.  Trust Title's assertion at trial that it had no means of enforcing these instructions, reflects its lack of diligence in monitoring third-party closings.  Mr. Fussell, who has similar instructions to third-party attorneys, agreed that getting third-party attorneys to perform in accord with his closing instructions can be difficult, but it is the only way to comply with the HUD contract requirements.  *See supra*, at 23-24.  To ensure compliance Mr. Fussell had at least two methods.  First, he could threaten uncooperative attorneys with a bar complaint, and second, he could cancel a closing if it became apparent the attorney would not be able to comply.  *See supra*, at 24.  Trust Title attacks Mr. Fussell's second method as inhumane.  In Trust Title's view, "[c]anceling settlements because [buyers] had difficulty either with title issues, their own funds, checks versus money orders supplied and other procedural problems, was not a humane way to proceed. . . .  Trust Title made the decision to stop and wait for people to provide necessary data, information, and funds so that they could settle on their house and occupy it."  Pl.'s Post-Trial Br. at 38-39.  Such reasoning does not justify delay in wiring funds to HUD.

Trust Title's failure to attend and monitor third-party closings is logically related to the difficulties Trust Title asserts it faced in getting third-party attorneys to send accurate and timely closing documents, recordation receipts, and funds.  Despite these problems with third-party attorneys, Trust Title actively suggested that buyers hire their own attorneys and generate third-party closings in lieu of allowing Trust Title to perform in-house closings.  Trust Title's principal impetus was to avoid commissioning a 30-year title search because one could be requested from the third-party attorney.  A third-party closing also reduced Trust Title's staff time.  In short, Trust Title's difficulty in working with third-party attorneys, to the extent it existed, is not the responsibility of HUD, and was a foreseeable impediment to be overcome in performing the contract.  *See Southeastern Airways Corp. v. United States*, 673 F.2d 368, 376-79 (Ct. Cl. 1982) (addressing excuses for failure to perform according to contractual specification); *see also* FAR § 52.249-8(c).

Setting aside Trust Title's problems in getting third-party attorneys to record deeds and disburse funds promptly, Trust Title still was not timely wiring funds to HUD.  Trust Title did not explain why it failed to timely wire funds to HUD for in-house closings, when it was in control of recording the deed and ensuring availability of proceeds.  On average, Trust Title disbursed funds 7.3 days after an in-house closing on the East contract, DX 227 at 2, and 6.7 days on the West contract, DX 229 at 2.  For comparison, on average, Trust Title wired funds 10

days after a third-party closing on the East contract, DX 228 at 4, and 10.3 days after closing on the West contract, DX 230 at 5.  Trust Title's consistent failure to wire funds within the time specified in the contract is a material breach of the contract.

Trust Title's overall delay in performing closings was also a material factor in its termination.  "A default termination for failure to make progress is 'appropriate if a demonstrated lack of diligence indicated that the government could not be assured of timely completion.'"  *Hannon Elec. Co. v. United States*, 31 Fed. Cl. 135, 143 (1994) (quoting *Discount Co. v. United States*, 554 F.2d 435, 441 (Ct. Cl. 1977)), *aff'd*, 52 F.3d 343 (Fed. Cir. 1995).  Trust Title had performed fewer than half of the assigned closings when it was terminated for default.  *See supra*, at 11.  Moreover, it failed to present a plan to clear the backlog.  Nearly all of the slightly over 1,000 cases ultimately assigned to Trust Title were assigned prior to October 7, 2010, the date of the show-cause letter.[39]  As of October 7, 2010, Trust Title had closed 128 cases.  *See supra*, at 7.  By the time it was terminated on November 9, 2010, Trust Title had closed 496 or 497 cases, *see supra*, at 11, but evidence at trial showed that Trust Title would have been unable to continue to close cases or effectively clear the backlog of cases while also receiving new ones.  By the end of October, Trust Title could no longer send orders for abstracts to two companies it had previously used, it was paying unsustainably large sums of money to hire lawyers on a per file basis, and it could not pay its employees, who, in turn, were quitting.  Ms. Barbee testified that she was aware of Trust Title's internal problems, Tr. 912:19-25 (Barbee), but even if she were not aware of the depth of those problems, this court may uphold the "default termination if justified by circumstances at the time of termination, regardless of whether the [g]overnment originally removed the contractor for another reason."  *Kelso*, 16 F.3d at 1175.

Trust Title argues that HUD refused to give it an extension in the early days of contract performance to account for the delay in the beginning of performance, the initial surge in contracts to be closed, both of which circumstances were beyond Trust Title's control.  According to Trust Title, "[o]n a simply mathematical basis under the contracts['] terms, Trust Title was entitled to at least a 105-day period of time before it was required to produce settled cases."  Pl.'s Post-Trial Br. at 10.  Trust Title claims it was entitled to a 30-day time extension for the protest, 45 days to produce a settled case under the HUD buyers' contract, and "at least 30 days to dig out from under the 600 stale and many incomplete cases dumped on it in the first two weeks of performance."  *Id.* at 10-11.  This claim is without support.  Trust Title was not automatically entitled to any such relief under the contract.  The contract allowed for the possibility of certain equitable adjustments, *at the request* of Trust Title.  *See supra*, at 5.  Mr. Gardner testified that Trust Title never requested any sort of equitable adjustment for the delay in the beginning of performance, nor did Trust Title ever inform HUD that it was rejecting orders.  Tr. 387:21 to 388:24, 399:12 to 401:1 (Gardner).

---

[39]Trust Title stopped receiving contracts the week of October 25, 2010.  That stoppage may not have been ordered by HUD with relation to Trust Title's performance, but rather may have been attributable to a stop-work order on the new asset management contract as HUD was replacing HMBI as its asset manager.  DX 235; Tr. 669:13 to 670:2 (Gardner).

It is apparent to the court that HUD's action in inundating a new contractor with hundreds of stale cases was ill-advised. By failing to continue to close contracts in July, a peak period of real estate sales, HUD's actions did not set Trust Title on a path to successful contract performance.  Even the most seasoned contractor would have been challenged by HUD's actions.  Nevertheless, the contract specifically included mechanisms by which Trust Title could have protected itself.  Absent a request from Trust Title for relief, HUD was not required to offer Trust Title any equitable adjustments or to discontinue assignment of cases to Trust Title when it became apparent that Trust Title was overwhelmed.  Accordingly, the initial assignment of a high volume of cases did not create an excusable delay for Trust Title's performance.

Similarly, Trust Title was not contractually entitled to a transition period at the beginning of contract performance.  As with HUD's decision to assign hundreds of cases within the first 30 days of performance, its decision to require immediate performance upon contract award was unwise, but contractually permissible.  Most significantly, when Trust Titled signed the modification for the East contract, reconfirming its ability to perform the contract as originally signed, it did not inform HUD that the delay in commencing performance had caused it to lose employees or office space.  *See supra*, at 3, 11-12.  Trust Title at that time, or within 30 days, could have requested an equitable adjustment to account for problems caused by the bid protest on the West contract or the delayed funding on the East contract.

The court recognizes that the contracting officer and the government technical representative appeared to give Trust Title little or no leeway in performing to the letter of the contractual terms.  E-mails presented at trial revealed a notable lack of assistance from government officials.  *See supra*, at 5, 21.  Even so, the government is correct in noting that a default termination may still be upheld where administration of the contract was "not exemplary," and the actions of unhelpful government officials do not excuse "plaintiff's naivet[é] in seeking and accepting contracts . . . , while possessed of such limited resources to perform them."  *Southeastern Airways*, 673 F.2d at 379.

The government presented substantial evidence at trial suggesting that Trust Title's delay in performing closings was largely caused by inadequate staffing and by its own internal work-flow decisions.  There is ample evidence in the record that Trust Title tried to implement a preferred-lawyer strategy to obtain free or low cost legal services necessary to perform closings in North Carolina.  This strategy ultimately turned out to be unsuccessful, and eventually Trust Title had no choice but to pay $125 to Mr. Fussell and $150 to Mr. Hazlehurst to provide the requisite attorney supervision for a closing.  *See supra*, at 17.  This amount of money was much larger than the $25 per closing that Trust Title had allocated for attorney supervision.  Tr. 352:13-19 (Gardner).  To alleviate the problems caused by a lack of access to legal services, Trust Title encouraged buyers to hire their own attorneys, which allowed Trust Title to request the title search from the third-party attorney.  This reliance in turn exacerbated Trust Title's delays in wiring proceeds to HUD from completed closings.

Lastly, Trust Title asserts that three legal doctrines dictate that its termination for default be converted to a termination for convenience.  Pl.'s Post-Trial Br. at 75-76.  First, Trust Title points to *Darwin Construction Co. v. United States*, 811 F.2d 593, 596 (Fed. Cir. 1987).  In *Darwin*, the Armed Services Board of Contract Appeals found that a contracting officer had

terminated a contract "solely to rid the Navy of having to deal with [the contractor]." 811 F.2d at 596 (internal quotation marks omitted).  The Board nonetheless upheld the termination for default because of a presumption that government officials act in good faith.  *Id.* at 595-96.  The court reversed the Board's decision because once the Board had determined the contracting officer's decision was arbitrary and capricious, it could not reasonably uphold the termination for default.  *Id.* at 596.  The Federal Circuit has since interpreted *Darwin* to stand for the proposition that a contracting officer's decision to terminate a contract for default is arbitrary and capricious when there is no nexus between the decision to terminate for default and contract performance. The government may not use a technical default by the contractor as a "pretext for terminating the contract on grounds unrelated to performance." *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999) (discussing *Darwin*).  *Darwin* is inapplicable to this case, where no pretext was involved.  Trust Title was terminated for reasons directly related to its performance.

Second, Trust Title asserts that "HUD may not change its prior interpretation of the same or similar contract provisions, in the new [Trust Title] contracts without advising [Trust Title] in advance, so that it may make necessary pricing adjustments when submitting its proposal for the contracts." Compl. ¶ 110 (citing *L.W. Foster Sportswear Co. v. United States*, 405 F.2d 1285 (Cl. Ct. 1969)).  Trust Title argues that it was held to a more stringent contract standard than the prior holder of the contract to perform closing services for HUD.  In that respect, Trust Title is correct insofar as it was held to an exacting standard of performance by HUD's contracting officials, but nonetheless those officials were acting in accord with, not divorced from, the terms of the contracts.

Third, Trust Title argues that the government was obligated to inform it of the problems its predecessor had faced in performance, especially because during the course of performance the title company awarded the earlier contract had to novate into a law firm.  Pl.'s Post-Trial Br. at 76 (citing *Helene Curtis Indus. v. United States*, 312 F.2d 774 (Ct. Cl. 1963)).  Nonetheless, Trust Title cannot reasonably argue that the government had "superior knowledge" of the difficulties a title company would face in performing closings in North Carolina when Trust Title openly acknowledged in its proposal that it knew attorney supervision was required for numerous steps in a sale of property in North Carolina.  *See Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1357 (Fed. Cir. 2007) (denying a superior knowledge claim where the contractor had "reasonable notice" of potential challenges in performance).

In sum, none of Trust Title's excuses suffice to explain or negate its flawed performance of material terms of its contracts with HUD.  Consequently, the court finds that the government has satisfied its burden of proof to sustain the termination for default.

## II.  REPROCUREMENT COSTS

The contracts provide that if the contractor is terminated for default, the government "may acquire, under the terms and in the manner the Contracting Officer considers appropriate, supplies or services similar to those terminated, and the [c]ontractor will be liable to the [g]overnment for any excess costs for those supplies or services" unless "the failure to perform the contract arises from causes beyond the control and without the fault or negligence of the

"[c]ontractor," such as "acts of the [g]overnment in either its sovereign or contractual capacity" or "acts of God." FAR § 52.249-8(b)-(c). The "excess costs" referred to in FAR § 52.249-8(b) are distinct from common law damages for breach of contract. *See M.E.S., Inc. v. United States*, 104 Fed. Cl. 620, 639 (2012) (explaining that "a claim for excess reprocurement costs under the 'Termination for Default' clause is different than one asserted under common law"); *see also* John Cibinic, Jr., Ralph C. Nash, Jr., and James F. Nagle, *Administration of Government Contracts ("Cibinic, Nash, & Nagle")* 981 (4th ed. 2006). Damages are measured by the difference between the reasonable reprocurement price and the defaulted contract price. *Armour of Am.*, 96 Fed. Cl. at 759. This measure of damages contrasts with that under the common law, where a "reasonable reprocurement price" would require a determination of the market price for the pertinent services or supplies. *Mega Constr. Co. v. United States*, 29 Fed. Cl. 396, 486-87 (1993).[40] The purpose of the excess-reprocurement-cost clause is to alleviate the burden of proving a market price for the reprocured services by instead looking to the government's actual cost of reprocurement. *M.E.S.*, 104 Fed. Cl. at 640 (citing *Marley v. United States*, 423 F.2d 324, 335 (Ct. Cl. 1970)). This evidentiary shortcut, however, requires certain predicate factual findings. Contractual excess reprocurement costs may only be imposed when the government can prove that: (1) the reprocured supplies are the same or similar to those involved in the termination, (2) the government actually incurred excess costs, and (3) the government acted reasonably to minimize the excess costs resulting from the default, *i.e.*, the government used the most efficient method of reprocurement to obtain a reasonable price and mitigate its losses. *Cascade Pacific Int'l v. United States*, 773 F.2d 287, 294 (Fed. Cir. 1985).

The first factor relating to similarity poses particular difficulties in this case. Initially, the government must establish that the reprocurement contracts are for substantially similar goods or services, though not necessarily identical. If it succeeds, then, "in this circuit, where a contractor's breach results in the necessity for reprocurement of substantially similar goods or services, the burden of proving the effects of changes in the reprocurement contract terms on the contract price is properly placed on the breaching contractor." *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1301 (Fed. Cir. 2002). Contrastingly, if the government fails to show that the services are similar it "loses its right to recover excess costs and must recover, if at all, under its common law right to damages." *Cibinic, Nash, & Nagle* 987.

These principles of government contract law are of long standing. In *United States v. Axman*, 234 U.S. 36, 42-45 (1914), the Supreme Court held that the government was not entitled to reprocurement costs on a dredging contract because the replacement contractor had been permitted to deposit the spoil in a place expressly prohibited to the terminated contractor. The Court reasoned that the location of dumping the spoil was not incidental to the contract, as the government argued, but instead, an "essential and particular term of the contract." *Id.* at 43. Since then, "[t]he cases in which the courts have barred a damage claim under *Axman* involved substantial and material changes in the physical nature of the performance, *i.e.*, the work to be performed or the goods to be delivered, from the original contract to the re-let contract." *Seaboard Lumber*, 308 F.3d at 1298.

---

[40]Although FAR § 52.249-8(h) preserves the government's right to common law breach of contract damages in cases of termination for default, the government has not pursued damages under the common law in this case.

Trust Title argues that even if it was properly terminated for default, the reprocurement cost assessment is improper because the reprocurement contracts were for "dissimilar services — they [were] done without reference to the requirements of the existing contract.  HUD ha[d] determined to purchase a different type of service at a higher cost than that which [p]laintiff stated it would provide in its proposal which was incorporated into the contract."  Compl. ¶ 162.[41]  Trust Title asserts dissimilar treatment because the reprocurement contracts were IDIQ contracts placed with law firms, not title companies, the reprocurement obligations were spread among four firms holding six contracts, and the contracts provided for some transitional arrangements.  Pl.'s Post-Trial Br. at 55-59.  The government responds that the IDIQ nature of the reprocurement contracts did not affect price, and consequently, the government's entitlement to excess reprocurement costs is not negated.  Def.'s Post-Trial Reply Br. at 34-36.  The government acknowledges that it "may not make substantial and material deviations in the reprocurement contracts from the original, [but] 'minor variations or deviations in the repurchase contract do not relieve the defaulted contractor of his liability for excess costs.'"  Def.'s Post Trial Br. at 50-51 (quoting *Armour of Am.*, 96 Fed. Cl. at 761 (internal citations omitted)).

The differences between the reprocurement contracts and Trust Title's contracts are sufficiently material to render the reprocurement dissimilar, such that the government is not contractually entitled to excess reprocurement costs.  HUD placed the reprocurement contractors in a substantially improved position at the outset of performance as compared to Trust Title.

Most importantly, HUD spread the work across six different IDIQ contracts.  *See Scevers*, IBCA No. 1358-5-80, 83-2 BCA ¶ 16579, 1983 WL 12991 (IBCA 1983) (denying excess reprocurement costs where a single services contract was reprocured as two separate contracts).  HUD specifically chose to use multiple contracts during the reprocurement to "make sure that the closings that Trust Title had not closed were going to be distributed evenly among a group of contractors."  Tr. 927:16-19 (Barbee).  By splitting the work among six different contracts, HUD ensured that no individual contractor was overwhelmed by a surge of business as Trust Title had been.  Not only was the work divided among six contracts, but HUD provided a transitional arrangement to reduce the pressure for immediate closings.  HUD implemented a buyer-select program from November 2010 until January 2011, when there was no contractor to perform closing services.  That program enabled buyers to select their own counsel for closing services, with an allowance provided by HUD to compensate for the work being provided.  *See supra*, at 9.  Notably, HUD had not implemented such a program in July 2010 when Trust Title was prevented from beginning performance, but rather had allowed a build-up of closings to occur, accompanied by frustrated buyers.  Additionally, it appears that the reprocurement contractors were given a short transition period after award of the contract.  Mr. Fussell was awarded his contracts on January 31, 2011, and he testified that he had about two weeks to get ready to begin performance.  Tr. 571:6-8 (Fussell); *see also* DX 91 (reflecting case assignment dates on Fussell's Eastern contract); DX 92 (reflecting case assignment dates on Fussell's Western contract).  Even then, Mr. Fussell was only given a manageable number of cases every

---

[41]Trust Title further contends that HUD never intended to have a title company perform closings and implies that HUD awarded the contract to Trust Title for the sole purpose of gaining reprocurement costs.  Pl.'s Mem. of Contentions of Law and Fact at 19-20.  There is no evidentiary support for this contention.

day.  *See* DXs 91, 92.  The other reprocurement contracts proceeded similarly.  *See* DX 93; DX 94; DX 95; DX 96; DX 97.

Contracts for services do not exist in a vacuum.  The context in which those services are to be provided is as relevant to a determination of similarity as the contracts' statements of work.  It is apparent to the court that HUD did not seek to reprocure substantially similar services because, for the above stated reasons, the conditions under which the reprocurement contractors were to perform were materially distinct from the conditions existing during Trust Title's performance.  Thus, the first *Cascade* factor is not met, and the government is not entitled to excess reprocurement costs.

## III.  LIQUIDATED DAMAGES

The government asserts that it is entitled to liquidated damages because the contracts incorporated FAR § 52.211-11, a liquidated damages clause which provides, "Late deposit of funds/wire transfer (per calendar day late) will be calculated using the following formula: Wire Transfer Amount x .03[] x number of calendar days late/360 = $."  *See* Def.'s Post-Trial Br. at 25; *see also* DX 15 ¶ F.4.  The contracting officer applied the formula to calculate the amount of the liquidated damages to be $14,007.65.  DX 23 at 2.  The government submitted exhibits at trial that justify this amount, *see* DX 227; DX 228; DX 229; DX 230, and Trust Title has not provided the court with any reason that liquidated damages should not be awarded in the amount requested.  Accordingly, the government is awarded liquidated damages in the amount it calculated.

## CONCLUSION

For the reasons stated, the court finds that Trust Title was properly terminated for default, but the government is not entitled to excess reprocurement costs.  The government is, however, awarded $14,007.65 in liquidated damages for late wire transfers during Trust Title's period of performance.  Judgment shall be entered for the government on Trust Title's claim and for the government on part of its counterclaim, *i.e.,* only for $14,007.65.  The clerk is directed to enter judgment in accord with this disposition.

No costs.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge